IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

R.B., et al.,                    :    CIVIL ACTION
                                 :    NO. 19-4035
          Plaintiffs,            :
                                 :
     v.                          :
                                 :
Downingtown Area School District, :
                                 :
          Defendant.             :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                      December 23, 2020

## I.    INTRODUCTION

This case involves whether a Student receiving special education in the Downingtown Area School District was denied a free appropriate public education ("FAPE") in kindergarten and first grade. Following a due process hearing before a state Hearing Officer, the parents of Student ("Parents") filed suit in this Court, alleging a violation of the Individuals with Disabilities Education Act ("IDEA"). The case proceeded with both parties filing motions for judgment on the administrative record. Parents challenged the Hearing Officer's denial of reimbursement for private school tuition/2018 Extended School Year ("ESY") services and independent educational evaluations. Parents also argue that the compensatory education award should

have been larger. Defendant ("the District") argued that the Hearing Officer erred in ordering them to provide compensatory education to Parents.

The District's motion will be denied because the Hearing Officer did not clearly err in finding a denial of FAPE for the 2016-17 and 2017-18 school years. Parents' motion will also be denied because they have not demonstrated that Student's Individualized Education Program ("IEP") was not implemented, that the May 2018 IEP constituted a denial of FAPE, or that the District's evaluations were flawed.

## II.   FACTUAL/PROCEDURAL BACKGROUND

Student is a primary elementary school-aged student residing in the Downingtown Area School District ("District"). Student is eligible for special education pursuant to the IDEA on the bases of an Other Health Impairment (i.e., ADHD) and a Speech/Language Impairment.

Student began school in the District in kindergarten and also attended first grade there, but attended a private school at the Parents' election for the 2018-19 school year and repeated first grade. The Parents' decision was made following the District's proposed program for that school year. Parents filed a due process complaint against the District, asserting that it denied Student a FAPE under the IDEA and Section 504 of the Rehabilitation Act of 1973, as well as the federal and state

regulations implementing those statutes. Their claims related to
the 2016-17 and 2017-18 school years, as well as the program
proposed for the summer of 2018 and the 2018-19 school year.

At the due process hearing, the Parents sought compensatory
education, reimbursement for tuition and related expenses at the
private school, and reimbursement for two private evaluations.
The District maintained that its special education program, as
offered and implemented, was appropriate for Student and that no
remedy was due.

As relevant here, the Hearing Officer concluded that the
2016-17 IEP, developed when Student was 4.5 years old and
entering kindergarten, was appropriate except that most of the
goals did not have baselines, so progress on the goals was
consequently "impossible to glean." Compl. Ex. 1, at 28, ECF No.
1-1. "As such, the progress monitoring reports and other
available information did not adequately inform the Parents, or
the Hearing Officer, on whether and how Student was achieving
the individualized expectations on [the relevant] IEP goals."
Id.

As to the following year (2017-18), during Student's first
grade, the Hearing Officer concluded:

> Student's impulsivity and lack of focus and attention
> was negatively impacting academic skills including
> reading to a marked extent, but the PBSP [Positive
> Behavior Support Plan] was not revised. Although
> academic interventions were implemented, a new FBA

> [Functional Behavior Assessment] in February 2018 did
> not result in any changes to the PBSP to any
> meaningful degree until the May 2018 [Revision IEP]
> that added interventions based on the FBA
> recommendations. Progress on many goals including
> those that did relate to behavior remained less than
> clear, and was important to understanding whether and
> how Student was or was not provided a FAPE in
> addressing behaviors appropriately during the 2017-18
> school year.

Id. at 29-30.

The Hearing Officer awarded compensatory education for the FAPE denial in the amount of "(a) two hours per week for each school day that the District was in session for students" during the 2016-17 school year; and "(b) one hour per week for each school day that the District was in session for students over the 2017-18 school year." Id. at 34. The Hearing Officer denied Parents' claim for reimbursement of private school tuition for 2018-19 and tuition for the 2018 Extended School Year (ESY) program Student attended. Id. Reimbursement for privately obtained evaluations was also denied. Id.

Parents filed a Motion for Judgment on the Administrative Record, challenging the Hearing Officer's conclusions in relation to the compensatory education award and the reimbursement for private school tuition, ESY tuition, and the evaluations. The District also filed a Motion for Judgment on the Administrative Record, challenging the Hearing Officer's conclusions in regard to the lack of baselines in the IEP goals

and the District's behavioral programming. These motions are now before the Court.

### III. LEGAL STANDARD

In considering a challenge to a hearing officer's decision on an IDEA claim, district courts employ a "modified de novo" standard of review. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003). District courts may reach different decisions than a hearing officer, but must accord the decision of the hearing officer "due weight." Carlisle Area Sch. Dist. v. Scott P. ex rel. Bess P., 62 F.3d 520, 524 (3d Cir. 1995). Under this standard, the hearing officer's factual findings "are to be considered prima facie correct." S.H., 336 F.3d at 270 (citing M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 530–31 (4th Cir. 2002)). "[I]f a reviewing court fails to adhere to them, it is obliged to explain why." Id. (alteration in original) (quoting M.M., 303 F.3d at 531). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." Id. (quoting M.M., 303 F.3d at 531). In other words, the Court is not to serve as the arbiter of sound educational policy.

Similarly, district courts must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a

contrary conclusion." Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting Scott P., 62 F.3d at 529). "In this context[,] the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." Id.

Importantly, "whether the District fulfilled its FAPE obligations" is "subject to clear error review as [a] question[] of fact." P.P. ex rel. Michael P. v. West Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009). And, "claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law." Id.

## IV.  DISCUSSION

### A. The District's Motion for Judgment

The District argues that "the hearing officer erred in two basic regards: (1) concluding the IEP goals did not contain baselines and so progress was 'impossible to glean' and 'less than clear,' and (2) concluding the school district did not respond properly to the February 2018 Functional Behavioral Assessment ('FBA')." Def.'s Mot. J. Administrative R. 1, ECF No. 16. These will be reviewed in turn for clear error.

### 1. Finding Regarding Baselines in IEP Goals

The IDEA provides that an IEP must include "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(II). Such a statement is

"designed to – (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability." Id. The IDEA also requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance." Id. § 1414(d)(1)(A)(i)(I).

In relation to the IEP goals determination, the District argues that the Hearing Officer erred because "[t]he law does not require 'baselines,' Lathrop R-II Sch. Dist. v. Gray, 611 F.3d 419, 425 (8th Cir. 2010), but goals that are measurable in context, Colonial Sch. Dist. v. G.K. ex rel. A.K., 763 F. App'x 192, 197 (3d Cir. 2019)." Def.'s Mot. J. Administrative R. 2-3, ECF No. 16.[1] The term "baselines" is a bit ambiguous, since the case law separates the term into two separate categories: (1) historical baseline data, and (2) baseline data regarding the Student's present levels of educational performance (PLEP). Given that the current dispute appears to center around the lack of baselines related to PLEPs, see Compl. Ex. 1, at 5-9, ECF No. 1, the majority of the District's case law becomes inapposite, as the cases either deal with historical baseline data or

---

[1]     The District and Parents both cite non-precedential cases in support because there are no precedential cases from the Third Circuit or analogous cases from the Eastern District of Pennsylvania.

situations in which PLEPs were present.[2] The District's argument is therefore only partially true. While the law does not require historical baselines, it does require baselines relating to the "child's present levels of academic achievement and functional performance." See 20 U.S.C. § 1414(d)(1)(A)(i)(I); Red Clay Consol. Sch. Dist. v. T.S., 893 F. Supp. 2d 643, 650-52 (D. Del. 2012). Consequently, the hearing officer's decision is not incorrect "[o]n this legal matter alone," as the District asserts. See Def.'s Mot. J. Administrative R. 18, ECF No. 16.

However, while a lack of PLEPs is an "undisputed procedural violation," "a procedural violation is not a per se denial of FAPE. Substantive harm must be further proven." Red Clay, 893 F. Supp. 2d at 651 (internal citation omitted) (citing Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 612 (6th Cir. 2006)). Substantive harm occurs if the preponderance of the

---

[2]     See Lathrop R-II Sch. Dist. V. Gray, 611 F.3d 419, 424 (8th Cir. 2010) ("The IDEA does not explicitly mandate such [historical baseline] data, however. What it does require is 'a statement of the child's present levels of educational performance . . . .'"); C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist., 575 F. App'x 796, 799 (9th Cir. 2014) ("[T]he baselines for C.B.'s goals in the IEP meet the requirements of the IDEA and provided sufficient information upon which to measure C.B.'s progress toward goals; any lack of greater specificity in the baselines did not amount to a denial of a FAPE." (citation omitted)); A.G. v. Paso Robles Joint Unified Sch. Dist., 561 F. App'x 642, 644 (9th Cir. 2014) ("Although the IDEA requires 'a statement of measurable annual goals,' it does not requires [sic] a statement of quantifiable baselines. Rather, the IDEA requires baselines to contain 'a statement of the child's present levels of academic achievement and functional performance.'" (citation omitted)); Red Clay Consol. Sch. Dist. v. T.S., 893 F. Supp. 2d 643, 650-52 (D. Del. 2012) ("[H]istorical baseline data is not a necessary component of an IEP, especially when that IEP had PLEPs from which to measure progress."); Candi M. v. Riesel Indep. Sch. Dist., 379 F. Supp. 3d 570, 580 (W.D. Tex. 2019) ("A PLAAFP [present level of academic achievement and functional performance] statement was included for each set of [IEP] goals and objectives.").

evidence shows that the "procedural inadequacies (i) [i]mpeded the child's right to a FAPE, (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 564 (E.D. Pa. 2013) (Robreno, J.) (quoting C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66-67 (3d Cir. 2010)).

The District cites at least two cases which have found that substantive harm does not exist as long as the IEP goals are objectively measurable.[3] On the other hand, Parents cite Methacton School District V. D.W., No. 16-2582, 2017 WL 4518765, at *7 (E.D. Pa. Oct. 6, 2017), where this Court affirmed a hearing officer's conclusion that "failure to obtain any baseline data meant that the goals themselves were insufficient to provide guidance to teachers regarding Student's specific

---

[3]    See Nack, 454 F.3d at 612 ("[T]he short-term objectives in the IEP are capable of measurement . . . . In the end, the minor procedural violations of the sixth-grade IEP cannot be said to have caused David any substantive harm."); Dudley v. Lower Merion Sch. Dist., No. Civ. A. 10-2749, 2011 WL 5942120, at *8 (E.D. Pa. Nov. 29, 2011) ("Although the[] [IEPs] state that 'a baseline for this goal will be established by the end of January 2009,' they nonetheless set forth measurable goals. . . . The lack of baselines, in and of itself, does not render the IEP inadequate."). The District also cites Kathryn F. v. West Chester Area School District, No. Civ. A. 12-6965, 2013 WL 6667773, at *3 (E.D. Pa. Dec. 18, 2013) (affirming hearing officer's conclusion that "[a]lthough none of these goals included baselines, they were . . . objectively measurable"), but it is not clear whether the hearing officer was discussing historical baselines or present level baselines.

instruction needs based on Student's disabilities, and the

expected progress at the district high school."

In relation to substantive harm, the District argues that

"[p]rogress reporting did not affect a FAPE" and that "[b]y

focusing on progress, the hearing officer wrongly imposed

liability based on outcome." Def.'s Mot. J. Administrative R.

19-20, ECF No. 16. However, the District misses the Hearing

Officer's point. The Hearing Officer found that:

> The one problem with the 2016-17 IEP and its
> implementation in this case, however, is a significant
> one: most of the IEP goals over the course of the
> 2016-17 school year lacked baseline information, and
> progress on the goals is therefore impossible to
> glean. As such, the progress monitoring reports and
> other available information did not adequately inform
> the Parents, or the hearing officer, on whether and
> how Student was achieving the individualized
> expectations on IEP goals in occupational therapy,
> speech/language, and social skills with behavioral
> components. This is particularly concerning given
> Student's impulsivity and other behaviors that
> interfered with Student's learning, and will be
> remedied through compensatory education.
>
> Compl. Ex. 1, at 28, ECF No. 1.

The Hearing Officer later concluded that "the District denied

Student FAPE with respect to providing sufficient baseline and

other quantifiable information in order to assess progress on

IEP goals over the course of the 2016-17 school year . . . the

flaws were apparent on the face of the IEP from the start." Id.

at 32.

The District's characterization is therefore inaccurate because the Hearing Officer did not hold that the District's progress reports caused the denial of a FAPE, but that the IEP denied Student a FAPE due to the lack of baseline information related to PLEPs. Similarly to the situation in Methacton, the focus of the issue here was the lack of baselines relating to PLEPs, and a consequence of that flaw was a lack of guidance regarding expected progress on the IEP goals. See 2017 WL 4518765, at *19. Consequently, the Court cannot say that the Hearing Officer wrongly imposed liability on outcome, since the focus was actually on the inadequacy of the IEP and the resulting lack of guidance regarding expected progress, rather than the Student's progress itself.

As a result of the foregoing, the Hearing Officer did not clearly err in her determination that the IEP's lack of baseline information relating to PLEPs constituted a denial of FAPE.

### 2. **Finding Regarding Behavioral Programming**

In relation to the 2017-18 school year, the Hearing Officer found that "unlike in the prior school year, there was more information about Student's baselines on the goals and progress toward those areas over the first grade year that, when considered together with all of the other information provided to the Parents, did not amount to a denial of FAPE." Compl. Ex.

1, at 29, ECF No. 1. However, the Hearing Officer found that

FAPE was denied on the basis of behavioral programming instead:

> The Parents correctly observe that Student's
> identified behaviors remained essentially constant
> over the two year period that Student was in the
> District. By first grade, however, Student's
> impulsivity and lack of focus and attention was
> negatively impacting academic skills including reading
> to a marked extent, but the PBSP [Positive Behavior
> Support Plan] was not revised. Although academic
> interventions were implemented, a new FBA [Functional
> Behavior Assessment] in February 2018 did not result
> in any changes to the PBSP to any meaningful degree
> until the May 2018 [Revision IEP] that added
> interventions based on the FBA recommendations.
> Progress on many goals including those that did relate
> to behavior remained less than clear, and was
> important to understanding whether and how Student was
> or was not provided a FAPE in addressing behaviors
> appropriately during the 2017-18 school year.

Id. at 29-30.

Where a student's behavioral problems are impeding

their ability to learn, and the school district fails to

address those problems in an appropriate way, such a

failure may constitute a denial of FAPE. See Lauren P. ex

rel. David P. v. Wissahickon Sch. Dist., 310 F. App'x 552,

554-55 (3d Cir. 2009) (non-precedential) (affirming the

district court's finding of a denial of FAPE due to

Wissahickon's failure to systematically and consistently

address student's behavioral problems which were impeding

her ability to learn).

Looking at the facts of this case, the Court cannot say that the Hearing Officer clearly erred in finding a denial of FAPE in the 2017-18 school year due to behavioral programming. Similarly to Lauren P., the District knew that distractibility was part of Student's disability, that this disability was negatively impacting Student's academic skills, and that Student's IEP was not working, as explained below. See id.

The District was well aware of Student's behaviors prior to the start of kindergarten, and Student's identified off-task and non-compliant behaviors persisted throughout kindergarten and first grade. See, e.g., Compl. Ex. 1, at 10, ECF No. 1 ("Student began the first grade school year exhibiting difficulty remaining focused and on task."). Student's identified behaviors remained essentially constant throughout kindergarten and first grade, but the District did not meaningfully change the PBSP until almost the end of the Student's first grade year, despite the fact that "Student's impulsivity and lack of focus and attention was negatively impacting academic skills including reading to a marked extent." Id. at 29. The District was also aware that Student's IEP was not working. Id. at 11 ("The teacher also indicated that

behaviors continued despite the use of charts and implementation of the PBSP.").

In the face of this record and the Hearing Officer's determination addressing Student's entire tenure in the District, the District's argument that the Hearing Officer "found the school district liable because it took about three months to make changes to the PBSP" mischaracterizes the Hearing Officer's conclusion. See Def.'s Mot. J. Administrative R. 21, ECF No. 16. A plain reading of the Hearing Officer's conclusion shows that the District did not meet its FAPE obligations for the entire 2017-18 school year.[4] Under these circumstances, the District was liable not only because of its failure in waiting until almost the end of the school year to add interventions based on the FBA recommendations from several months before, but also because of its failure to properly address Student's behavioral needs all year. The District was aware of the behavioral issues identified in the February 2018 FBA at the beginning of the school year (and even before that), and yet the PBSP was not meaningfully changed until almost the end of the school year.

---

[4]     Hence the Hearing Officer's compensatory education award of "one hour per week for each school day that the District was in session for students over the 2017-18 school year." Compl. Ex. 1, at 34, ECF No. 1.

14

This case is also different from <u>Coleman v. Pottstown</u> <u>School District</u>, 983 F. Supp. 2d 543 (E.D. Pa. 2013) (Robreno, J.), where the school district took proactive steps to address Student's misbehavior, which was periodic rather than ongoing. In that case, at the time the student's IEP was developed, "members of the IEP team believed that the behavioral plan in the prior IEP was working, that [student's] social skills were improving, and that the weekly counseling sessions sufficiently addressed [student's] behavioral problems." <u>Id.</u> at 558. In the instant case, members of the IEP team were aware in the beginning of first grade that Student's PBSP was not working, that Student's behaviors were continuing despite implementation of the PBSP, and that the use of behavioral charts was not sufficiently addressing Student's problems, and yet no meaningful revisions were made to the PBSP until close to the end of the school year, even though the IEP was revised in January as well.

The District also argues that "the question is one of parent participation in decision-making about how the school district responded to the FBA, and that is a procedural matter." Def.'s Mot. J. Administrative R. 21, ECF No. 16. It is unclear how the District came to this conclusion, but a plain reading of the Hearing Officer's conclusion suggests that the question is

not one of parent participation, but rather concerns the content of the IEP (for which the PBSP is a part of).[5] The Third Circuit has held that "[t]he content of an IEP . . . does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 274 (3d Cir. 2012) (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010)). Given that the issue here is the inadequate content of the PBSP (due to the District's failure to update the PBSP with new strategies despite ongoing awareness of Student's behavioral needs), the Court cannot say that the Hearing Officer clearly erred in concluding that the behavioral programming in 2017-18 denied Student a FAPE.

As a result of the foregoing, the District's Motion for Judgment on the Administrative Record will be denied.

**B. Parents' Motion for Judgment**

Parents make three arguments: 1) the Hearing Officer's compensatory education award was insufficient; 2) the Hearing Officer's denial of tuition reimbursement was legal error; and 3) the Hearing Officer erred in failing to reimburse Parents for the costs of Student's independent educational evaluations (IEEs). These arguments will be addressed in turn under plenary review.

---

[5]     The fact that Student's parents participated in a March 2018 IEP meeting and signed a Notice of Recommended Educational Placement (NOREP) does not change the inadequate nature of the IEP's content.

### 1. <u>Conclusion Regarding Compensatory Education</u>

Compensatory education is an appropriate form of equitable relief where a local educational agency ("LEA") knows, or should know, that a child's special education program is not appropriate or that he is receiving only trivial educational benefit, and the LEA fails to take steps to remedy deficiencies in the program. <u>See</u> <u>M.C. v. Cent. Reg'l Sch. Dist.</u>, 81 F.3d 389, 397 (3d Cir. 1996). Longstanding Third Circuit precedent demonstrates that this type of award is designed to compensate the child for the period of time of the deprivation of appropriate educational services, while excluding the time reasonably required for a school district to correct the deficiency. <u>Id.</u>

There are also cases in which a denial of FAPE creates a harm that permeates the entirety of a student's school day. In such cases, full days of compensatory education (meaning one hour of compensatory education for each hour that school was in session) may be warranted when the overarching impact of a district's denial of FAPE resulted in a pervasive loss of a student's educational benefit. <u>See</u> <u>Tyler W. v. Upper Perkiomen Sch. Dist.</u>, 963 F. Supp. 2d 427, 438-39 (E.D. Pa. 2013) (finding that a district's failure to address a student's needs pervaded his entire school day and warranted the award of full days of

compensatory education where "there was absolutely no implementation of [student's] IEP").

The Hearing Officer found that "the denial of FAPE was rather limited in this matter." Compl. Ex. 1, at 31, ECF No. 1. With respect to the 2016-17 school year, the Hearing Officer concluded that the District denied Student FAPE by failing to provide sufficient baseline information in order to assess progress on IEP goals over the course of the school year. Thus, the Hearing Officer used the amount of special education specified in the April 2017 IEP as an "equitable and reasonably-related number to quantify the compensatory education," and awarded Student two hours of compensatory education for each week that the District was in session for students over the 2016-17 school year. Id. at 32. "No period of rectification [was] made because the flaws were apparent on the face of the IEP from the start." Id.

In relation to the 2017-18 school year, "where FAPE was denied on the basis of behavioral programming but other interventions were appropriate," the Hearing Officer concluded that "the increase in special education support leads to an equitable adjustment to one half of the amount of compensatory education for the 2016-17 school year." Id. Thus, one hour of compensatory education was awarded for each week the District was in session for students over the 2017-18 school year.

18

Parents argue as follows:

The Hearing Officer erred. The error principally arose
from the Hearing Officer's failure to properly account
for (1) the District's failure to appropriately
program for Student's reading needs, and (2) the
extent to which the District's denial of FAPE
permeated Student's school day and impacted all
domains of Student's progress. The record here
supports an award of full days [of] compensatory
education because like in those cases where Courts
award full days, Student made little to no progress.
This indicates that the District's failure to address
Student's needs pervaded his entire school day and
warrants the award of full days of compensatory
education. This Court should award additional
compensatory education to compensate Student for the
District's failure to provide an appropriate reading
program, social skills programming, executive
functioning supports, and appropriate behavior
interventions.

Pls.' Mot. J. Administrative R. 20, ECF No. 17.

As to the Parents' first argument, the record does not

support their conclusion that the District failed to

appropriately program for Student's reading needs.[6] To the

contrary, and as the Hearing Officer noted in her report, "[t]he

record as a whole supports the conclusion that the District

recognized Student's reading skill weaknesses as they were

manifested and responded with increasingly more intensive

supports through the 2016-17 and 2017-18 school years." Compl.

Ex. 1, at 26, ECF No. 1-1.

---

[6]      Parents do not appear to disagree with any of the Hearing Officer's
specific factual findings, but rather disagree with the legal conclusion
regarding compensatory education that was drawn from those facts.

Student's benchmark testing in winter 2016-17 revealed that Student was only below expectations in one of the four early reading skills assessed.[7] Id. at 25. Student thus continued with regular education reading instruction (including Multi-Tiered System of Supports ("MTSS")), and it was only at the end of kindergarten that Student began displaying weaknesses in other early reading skills on benchmark assessments. Id. Importantly, however, Student received an average score on an academic achievement test in April 2017 and on that measure only attained a "low average" score in oral reading fluency. Id. at 25-26. Student had also moved into a pre-primer reading level by that time. Id. at 26. Based on this performance and data, and when viewed in context (i.e., Student was one of the youngest in the grade given the kindergarten cut-off date), it was reasonable for the School District not to rush to judgment quite yet. See D.K. v. Abington Sch. Dist., 696 F.3d 233, 251 (3d Cir. 2012) (finding school district was correct not to "jump to . . . conclusion[s]," particularly for younger students); Bd. of Educ. v. L.M., 478 F.3d 307, 313-14 (6th Cir. 2007) (same); see also K.D. ex rel. Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 255 (3d Cir. 2018) ("We may not rely on hindsight to second-guess an educational program that was reasonable at the time.").

---

[7]   It is also important to note that Student was in kindergarten at the time and the classroom included students with varied reading skills.

By the start of first grade, Student's reading skills remained below expectations in several areas, so the District moved Student to a more intensive MTSS level. Compl. Ex. 1, at 26, ECF No. 1-1. By the time of the November 2017 Reevaluation Report ("RR"), individualized reading instruction was recommended and Student started working with a reading specialist while the IEP team worked to schedule a meeting that was eventually held in January 2018. Id. As the Hearing Officer noted, "[a]lthough Student was not identified as having a specific learning disability in reading, Student began receiving reading instruction with the learning support teacher addressing needs in decoding, encoding, and sight words, with two goals in the IEP directly related to Student's areas of early reading skills deficits." Id.

Parents argue that the Wilson Reading program, which private evaluators recommended and which Student allegedly benefitted from in private school, demonstrates the type of programming that the District should have provided to Student. But the IDEA does not guarantee a specific methodology/intervention or a specific outcome from the programming that is provided. The IDEA "open[ed] the door of public education to [disabled] children on appropriate terms" but did not "guarantee any particular level of education once inside." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.

Rowley, 458 U.S. 176, 192 (1982); see also Endrew F. ex rel
Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 998
(2017) ("No law could do that—for any child."); Polk v. Cent.
Susquehanna Intermediate Unit 16, 853 F.2d 171, 179 (3d Cir.
1988) (noting the Rowley Court's focus on access to special
education and conclusion that the IDEA does not "guarantee any
particular level of education once inside").

Notably, although Student's private neuropsychologist
recommended the Wilson program and recommended that the District
program for a specific learning disability in reading and the
related areas of writing and spelling, she did not base that
recommendation on eligibility criteria in the IDEA. Compl. Ex.
1, at 26, ECF No. 1-1. This is also not a case where MTSS was
used to delay an evaluation; Student was evaluated twice by the
District during the relevant time period without identification
of a specific learning disability. Id. Although, as Parents
note, a finding of a specific learning disability was not a
prerequisite to a requirement to meet Student's reading needs,
the findings, when taken in the context set out above, help to
understand the District's reasonable decision not to "jump to .
. . conclusion[s]" and to wait until first grade to provide
Student with a reading specialist. See D.K., 696 F.3d at 251;
L.M., 478 F.3d at 313-14.

With respect to written expression and spelling, concerns with those (beyond fine motor skills) were not raised until April 2018 and the District responded with a SETT (Student, Environment, Task, Tools) evaluation and action plan. Compl. Ex. 1, at 27, ECF No. 1-1. In short, the Parents have not met their burden of establishing that the District violated the IDEA with respect to programming for Student's reading/writing needs.

Next, Parents argue that the record supports an award of full days of compensatory education because like in those cases where Courts award full days, Student made little to no progress and the District's denial of FAPE impacted all domains of Student's progress. However, the cases that Parents cite are inapposite. The only precedential case, Tyler W., involved a student in a partial hospitalization program ("PHP") who only received one hour of academic instruction per day, and even that hour was not compliant with the specially designed instruction in the student's IEP.[8] 963 F. Supp. 2d at 438 ("[T]here was

---

[8]     Parents' non-precedential cases are likely inapposite or unhelpful to their argument. See Jana K. v. Annville-Cleona Sch. Dist., 39 F. Supp. 3d 584, 600-10 (M.D. Pa. 2014) (awarding full days of compensatory education in a situation where no IEP was implemented at all due to a school district's failure to identify the student as a student in need of special education -- the district had ample reason to suspect that the student suffered from a disability, and yet never initiated an IDEA evaluation); Keystone Cent. Sch. Dist. v. E.E., 438 F. Supp. 2d 519 (M.D. Pa. 2006) (affirming a Panel's award of full days of compensatory education for two school years in which there was no IEP in place for one of the years, and a denial of FAPE for the other year, but the court does not explain why there was a denial of FAPE); Damian J. v. Sch. Dist. of Phila., No. 06-3866, 2008 WL 191176 (E.D. Pa. Jan. 22, 2008) (awarding full days of compensatory education where student's emotional support classroom teachers failed to implement substantial provisions of student's IEP); Montgomery Cnty. Intermediate Unit No. 23 v. C.M., No. 17-

absolutely no implementation of [student's] IEP."). The record in this case certainly does not support such a "total failure to implement [student's] IEP." See id. at 439. As explained above, there is no indication that the IEP itself was not implemented. The issues narrowly lie in the content of the IEP and whether certain items should have been added or updated in the IEP.

As a result of the foregoing, the Court will affirm the Hearing Officer's conclusion that additional compensatory education is not warranted in this case.

### 2. **Conclusion Regarding Tuition Reimbursement**

To determine whether parents are entitled to reimbursement for their unilateral placement of a student in private school after refusing a public school's offered IEP, courts apply a three-part test (the "Burlington-Carter" test) based upon School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985) and Florence County School District Four v. Carter by and Through Carter, 510 U.S. 7 (1993). Under this test, the party seeking relief must show: (1) the public school did not provide a FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement. See Florence, 510

---

1523, 2017 WL 4548022 (E.D. Pa. Oct. 12, 2017) (affirming an award of five hours per day of compensatory education where student "was not receiving the amount of personal care assistance initially recommended by [Plaintiff's] own staff and services to which he was entitled under his IEP were being provided on a delayed or intermittent basis" for at least half of the time in which compensatory education was granted).

U.S. at 12-16; <u>Burlington</u>, 471 U.S. at 374. The parties'
disagreement in this case turns on prong (1) and whether the May
2018 IEP provided Student with a FAPE. On that issue, the
Hearing Officer found as follows:

> That [May 2018] IEP was responsive to Student's
> identified needs including in reading, written
> expression, and spelling. By that time, more detailed
> relevant baseline information was available for the
> goals, and the PBSP had been revised to address the
> data from the February 2018 IEP to add strategies
> pursuant to that new information. The proposed ESY
> services targeted the areas that Student needed to
> maintain over the summer: reading, occupational
> therapy, and social skills. That the Parents may have
> wanted Student to make more progress over the summer
> of 2018, especially in reading, is not a basis to
> fault the District's ESY proposal. Moreover, after
> receipt of the Parents' private evaluations, the
> District convened a meeting to consider the new
> information as it was required to do and suggested a
> revision to the IEP in accordance therewith. 34 C.F.R.
> § 300.502(c). The denial of FAPE does not extend to
> the offer for ESY in 2018 or the 2018-19 school year.

Compl. Ex 1, at 30, ECF No. 1-1.

Parents disagree and argue that several components of the
May 2018 IEP denied Student a FAPE. First, Parents argue that
"[c]ontinuing with the same goal in social skills after two
years despite that Student repeatedly touched, kicked, or
physically contacted peers inappropriately is not FAPE." Pls.'
Mot. J. Administrative R. 27, ECF No. 17. It is not clear why
Parents object to the goal remaining the same for social skills
while simultaneously objecting to a "tweak to the occupational
therapy goal (even though Student had not met it)." <u>Id.</u> It is

also not clear which "goal" Parents are referring to, or even that Student was "repeatedly" exhibiting those behaviors. After the 2018 FBA was conducted, "Student received one behavior report in March 2018 for touching and hitting other students two days in a row; and another in April 2018 for kicking a peer during recess. The teacher discussed the latter incident with Student and Student completed a behavior report." Compl. Ex. 1, at 13, ECF No. 1-1. The record shows that the PBSP was revised in May 2018 to remove physical contact with peers as a behavior of concern, but that ESY services related to social skills, among others, were added to help Student maintain these social skills over the summer. Id. at 14. Afterwards, progress monitoring in late spring 2018 and June 2018 showed that Student was approaching mastery in respecting personal space in a small group setting with prompts. Id. at 14-15. Consequently, the District appears to have handled Student's physical behavioral issues appropriately.

Next, Parents argue that "increasing reading instruction from 30 to 45 minutes per day without a systematic, phonics-based, multisensory reading program such as Wilson was not FAPE. . . . Student was instructed using a staggering seven different curricula and one phonics game." Pls.' Mot. J. Administrative R. 28, ECF No. 17. Parents seem to be confusing a publisher's program (such as Wilson) with a curriculum. Given that the

26

fundamental purpose of special education is to address the
unique needs of a student resulting from their disability, it is
not unusual that an individualized education program would
utilize different instructional programs to address the
student's varying needs.

Furthermore, the District only "refused to use Wilson,"
id., after Ms. Butler (Student's special education teacher)
carefully considered and determined that Wilson was not
appropriate for Student. One of the programs Student was
receiving was Fundations, which is produced by the Wilson
Reading System and is very similar to Wilson Reading. Thus,
while Ms. Butler considered Wilson, she ultimately rejected it
because of Student's demonstrated difficulty with Fundations,
which is very similar. She thus chose to use Reading Mastery
instead, which Student was responding to, as evidenced by his
progress.[9] The fact that Parents wanted Student to make more
progress than he did or the fact that Student benefitted from
Wilson at private school does not mean that the District's
choice of program was unreasonable. "We may not rely on
hindsight to second-guess an educational program that was

---

[9]     The April 2018 assessments showed that Student increased his F&P
(Fountas-Pinnell) guided reading level from B to D, and testimony from Meghan
Dennis (the Supervisor of Special Education) supports Student's progress as
well: "After speaking with Mom, I also looked at his data and he seemed to
really be responding at that time. His rate of improvement really increased
sort of in that early spring coming to the end of the school year, he seemed
to really be responding to SRA, the Reading Mastery program." Dennis Test.
657:5-11.

reasonable at the time." K.D., 904 F.3d at 255; see also D.S., 602 F.3d at 564-65. In this case, Parents have not met their burden of showing that the District's reading program for Student was unreasonable at the time.

Lastly, Parents also argue that the May 2018 IEP denied Student a FAPE because it "included the same executive functioning programming that had failed Student for two years." Pls.' Mot. J. Administrative R. 28, ECF No. 17. The record disputes this assertion—the May 2018 IEP proposed to switch Student's program from Skills Streaming to a new program the District had just acquired, which would be implemented in small group instruction (with two other first graders), thirty minutes per cycle. See Compl. Ex. 1, at 13-14, ECF No. 1-1; Def.'s Resp. to Pls.' Mot. J. Administrative R. 15, ECF No. 18. In this case, Parents have not met their burden of showing that the District's new program for Student was unreasonable at the time.

As a result of the foregoing, the Court will affirm the Hearing Officer's conclusion that the May 2018 IEP did not deny Student a FAPE. Therefore, Parents' request for tuition reimbursement and reimbursement for ESY 2018 was correctly denied.

### 3. Conclusion Regarding IEEs

Parents argue that the Hearing Officer erred in not reimbursing them for Student's independent educational

evaluations (IEEs). "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency . . . ." 34 C.F.R. § 300.502(b)(1) (2019) (emphasis added).

Parents argue that the Third Circuit applies § 300.502(b)(1) broadly to permit reimbursement not only when plaintiffs expressly disagree with an evaluation, see Warren G. by and Through Tom G. v. Cumberland County School District, 190 F.3d 80, 87 (3d Cir. 1999), but this is an incorrect reading of the case law. Warren G. held that parents do not need to disagree with a public evaluation before seeking an IEE, see id., not that parents can avoid expressly disagreeing altogether. The Third Circuit, in a non-precedential opinion, recently addressed this standard in M.S. v. Hillsborough Township Public School District, 793 F. App'x 91, 93 (3d Cir. 2019):

> [A] parent must disagree with an evaluation before there is a right to obtain public funding for an IEE. Neither our prior decision, nor, more importantly, the text of the statute, can be read to permit reimbursement without ever disagreeing with the prior evaluation. Put differently, Warren G. addressed when a disagreement may arise, not whether a disagreement is necessary. And the text of the statute and regulations make plain that it is.

In this case, the Hearing Officer found that even if the Parents had specifically disagreed with the District's evaluations, there would be "no rational basis for ordering

reimbursement for two evaluations that did not contribute in any meaningful way to an understanding of Student's education-related needs." Compl. Ex. 1, at 33, ECF No. 1-1. Parents argue that this conclusion is incorrect because "[t]he evaluations identified Student's specific reading, social skills, and executive functioning deficits[10] and provided recommendations for necessary programming changes that the District's evaluations lacked." Pls.' Mot. J. Administrative R. 32, ECF No. 17.

Here, the IEE concluded that Student was eligible for special education under Other Health Impairment (which the District had already identified), but also suggested consideration of Specific Learning Disability in reading, spelling and writing. Compl. Ex. 1, at 16, ECF No. 1-1. This latter conclusion was essentially based on grade equivalency scores, which the private neuropsychologist noted "should be interpreted with caution, did not mean that the student was performing at that level, and could be unpredictable." Id. Student was also evaluated by a private reading specialist who similarly noted that grade equivalencies "do not indicate the grade level at which the child is functioning." Id. (emphasis in original).

---

[10]    Children at that age are not expected to demonstrate a high level of executive functioning skills, so there remains disagreement over whether Student's executive functioning weaknesses actually qualify as a "deficit," but as discussed above, the School District provided programming nonetheless.

Given that Student was not formally diagnosed with a specific learning disability, it is not clear how the evaluations helped to further any understanding of Student's educational needs, particularly since the District had already identified reading weaknesses and was already providing reading support, as discussed above. The District's evaluations also identified Student's issues with social skills, so given the lack of detail in the Parents' brief, their argument seems to boil down to the programming provided, rather than the evaluations themselves. Although both evaluators made programming recommendations that aligned with the Parents' wishes, no authority entitles Parents to choose which programming the District provides, as explained above.

Since there is no indication that the District's evaluations were flawed, and the only issues relate to the content of the IEPs (as discussed above and already remedied), the Court will affirm the Hearing Officer's conclusion denying reimbursement for the Parents' IEEs.

## V.   CONCLUSION

For all of the aforementioned reasons, both motions for judgment on the administrative record will be denied.

An appropriate order follows.